1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| DIRECTV, Inc.,<br><br>                    Plaintiff,<br><br>            v.<br><br>SCOTT PAHNKE, et al.,<br><br>                    Defendants. | **1:03-CV-06246 OWW SMS**<br><br>**ORDER GRANTING DEFENDANT'S UNOPPOSED PARTIAL MOTION FOR SUMMARY JUDGMENT (DOC. 57)** |

### I.   <u>INTRODUCTION</u>

This is one of many civil anti-piracy cases brought by DIRECTV, Inc., ("Plaintiff") in this district.  In this case, Plaintiff alleges that Defendant SCOTT PAHNKE intercepted DIRECTV satellite programming in violation of the Federal Communications Act of 1934 ("FCA"), 47 U.S.C. § 605; the Electronic Communications Privacy Act, also known as the Wiretap Act, 18 U.S.C. §§ 2510-2521 ("Wiretap Act"); and California common law.

Defendant, appearing pro se, answered the complaint and filed several other motions during the early stages of this litigation, including a successful motion to dismiss one of the counts.  However, for the past several months, Pahnke has, after being given opportunities to do so, failed to respond to any communications from Plaintiff's counsel, failed to appear for

**1**

several scheduling conferences, and failed to make initial
disclosures or respond to any discovery requests.  The district
court sanctioned Defendant for this conduct by "precluding him
from using any evidence to respond to any dispositive motion or
at trial that he should have provided as part of his initial
disclosures."  (Doc. 52.)  Despite affording Defendant two
opportunities to defend the case, Mr. Pahnke appears to have
abandoned any defense of the case and has failed to communicate
with Plaintiff's counsel or the court.

On October 11, 2005, Plaintiff moved for summary judgment.
(Doc. 57.)  Defendant has filed no opposition or statement of
non-opposition, nor has he filed any other responsive documents.
Efforts to locate Mr. Pahnke have been unsuccessful.

## II.   **STATEMENT OF FACTS**

DIRECTV is a direct broadcast satellite television service
that offers programming to residential and business customers on
a subscription and pay-per-view basis only.  (Whalen Decl. ¶ 5.)
DIRECTV encrypts its satellite transmissions to prevent
unauthorized viewing of its programming.  In order to receive and
view DIRECTV programming, each customer must establish an account
with DIRECTV and obtain DIRECTV satellite hardware (including a
small satellite dish, a DIRECTV integrated receiver/decoder
("IRD"), and a DIRECTV Access Card).  (*Id.*)

A number of entities and individuals manufacture and sell
illegal devices that are capable of overcoming DIRECTV's
encryption technology and security measures (so called "Pirate
Access Devices").  (*Id*. at ¶12.)  On May 25, 2001, a raid was

executed at the shipping facility used by several major sources
of Pirate Access Devices, including White Viper Technologies
("White Viper").   Sales records obtained during and subsequent to
those raids revealed that Defendant purchased five (5) illegal
Pirate Access Devices from White Viper:  one (1) programmer
primarily designed to illegally modify DIRECTV Access Cards
called a "Viper Smart Card Reader/Writer"; two (2) programmers
primarily designed to illegally modify DIRECTV Access Cards,
called "Viper Reader/Writers"; and two (2) circuit board devices,
called "Viper Super Unloopers" from White Viper.  (*Id*. ¶¶ 25 &
26; Exh. "A" to the Whalen Decl.).

The "Viper Smart Card Reader/Writer" and "Viper
Reader/Writers" are designed, marketed, and used to program <u>valid</u>
DIRECTV Access Cards for the sole purpose of obtaining access to
DIRECTV Satellite Programming <u>without paying DIRECTV</u>.   For
example, the programmer may be used (i) to "clone" Access Cards,
enabling an unactivated Access Card to decrypt the same
programming as a particular authorized (or activated) Access
Card; or (ii) to program Access Cards to receive all DIRECTV
programming, including pay-per-view events, without payment to
DIRECTV.   (Whalen Decl. ¶28).

The "Viper Super Unloopers" purchased by Defendant are also
used to gain unauthorized access to DIRECTV satellite programming
without payment to DIRECTV.   Specifically, an "unlooper" is
designed to restore illegally modified DIRECTV access cards that
have been disabled by misuse or by DIRECTV's electronic security
measures commonly referred to as Electronic Counter Measures or
"ECMs."  (*Id*. at ¶27.)   DIRECTV sends ECM by satellite to disable

**3**

DIRECTV access cards that are being used illegally to receive DIRECTV programming without authorization.  Once these cards are disabled or "looped," they no longer allow free viewing of DIRECTV programming, unless another electronic device is used to "unloop" the card to restore its (illegal) functionality. (Whalen Decl. ¶ 27).

Defendant admitted purchasing and using each of the subject devices.  (Osaki Decl. ¶¶ 4 & 5; Exh. "C".)  Moreover, Defendant possessed the necessary DIRECTV equipment to intercept its satellite signal without authorization by or payment to DIRECTV. Specifically, on or about March 11, 2000, Defendant purchased DIRECTV satellite equipment.  This equipment was activated on or about March 30, 2000.  (Whalen Decl. ¶30; Exh. "B"; Osaki Decl. ¶¶4 and 5(h); Exh. "C".)

### III.   **PROCEDURAL HISTORY**

On September 12, 2003, DIRECTV filed a complaint against Defendant Pahnke and three other individuals, alleging that each of the defendants purchased "Pirate Access Devices" capable of decrypting DIRECTV's encrypted satellite television programming and used the devices to receive DIRECTV's programming without authorization, in violation of several federal anti-piracy statutes.  (Doc. 1.)

Pahnke answered on February 24, 2004, Doc. 13, and appeared for a scheduling conference on March 19, 2004.  (*See* Doc. 19.) At that conference, the district court noted that DIRECTV may have misjoined Defendants "who have no relation to each other factually or legally."  The district court then issued an order

**4**

1  to show cause why "DIRECTV, Inc., and its [prior] attorneys
2  should not be sanctioned for misjoining parties, after having
3  been ordered not to do so in other districts of the United
4  States." (*Id.* at 2.)  DIRECTV responded to the order. (Docs. 20
5  & 21, filed Apr. 2, 2004.)  Pahnke also filed a reply concerning
6  the order to show cause. (Doc. 22, filed Apr. 13, 2004.)  On May
7  7, 2004, the district court dismissed the claims against
8  Defendants Santos and Vasquez, subject to re-filing, on the
9  grounds that they had been misjoined. (Doc. 25.)  The district
10 court also ordered prior counsel for DIRECTV to show cause why
11 she should not be sanctioned for lack of candor and misciting
12 legal authority to the court. (*Id.)*

13     DIRECTV responded to this second order to show cause on June
14 18, 2004.  On August 18, 2004, the district court found there had
15 been no violation and declined to impose sanctions against
16 DIRECTV or its prior counsel.

17     Defendant Pahnke then moved to dismiss Count III of the
18 complaint on the grounds that no private cause of action is
19 available for a violation of 18 U.S.C. § 2512, a criminal
20 statute. (Doc. 31, filed Aug. 31, 2004.)  DIRECTV filed a notice
21 of non-opposition, (Doc. 33, filed Sept. 8, 2004), and Count III
22 was dismissed against Defendant Pahnke, (Doc. 36, filed Sept.,
23 22).

24     Then, Defendant Pahnke stopped participating in this
25 litigation.  Plaintiff's new counsel attempted to contact
26 Defendant on November 22, 2004 "to request Defendant's input and
27 cooperation to prepare and file a Joint Scheduling Report." (*See*
28 Doc 46, Shah Decl., Ex. A.)  Pahnke did not respond to the

**5**

letter, and failed to appear at the December 3, 2004 scheduling conference. (*See* Doc. 41 and Shah Decl. at ¶4.) The court set a scheduling conference date. Defendant Pahnke again failed to appear at the rescheduled conference date. (*See* Doc. 42, filed Jan. 5, 2005.) The district court again continued the scheduling conference, on the condition that Defendant first serve initial disclosures as required by Federal Rule of Civil Procedure 26(a), on or before February 5, 2005. (Doc. 43, filed Jan. 7, 2005.) DIRECTV mailed the Scheduling Conference Order to Defendant at his work and residential addresses. (Shah Decl. ¶6, Exh. D.)

In reference to Defendant's failure to file his initial disclosures and to participate in the status conference, the district court authorized DIRECTV to "take such steps as it deems necessary and appropriate." (Doc. 43 at 2.) On March 28, 2005, Plaintiff filed a motion requesting the imposition of Rule 37 sanctions for Defendant Pahnke's "unjustified and continuous failure to comply with his discovery and case management obligations." (Doc. 46.) The district court issued an evidentiary sanction under Rule 37 prohibiting Defendant from introducing evidence in any proceeding in this case, regarding witnesses, documents, or information that Defendant should have included in his initial disclosures. (Doc. 52.) The district court also ordered Defendant to pay monetary sanctions in the amount of $4,438.00 for attorney's fees incurred by DIRECTV to pursue the motion for sanctions. (*Id.*) Plaintiff moved for summary judgment on October 11, 2005. (Doc. 57.)

//
//

## IV.   STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Even in an unopposed motion for summary judgment, the moving party nevertheless bears the burden of showing it is entitled to judgment as a matter of law.

## V.   DISCUSSION

### A.   Defendant's Failure to Respond to Plaintiff's Request for Admission.

On August 5, 2005, Plaintiff served requests for admission upon Defendant.  (Osaki Decl. ¶4.)  His response was due September 7, 2005.  As of December 1, 2005, Defendant had not filed any response.  Absent any response or other objection from Defendant, the matters asserted are therefore deemed admitted under Federal Rule of Civil Procedure 36(a).  *See also Hadley v. United States*, 45 F.3d 1345 (9th Cir. 1995).

### B.   Federal Communications Act Claim.

Section 605(a) of the FCA, which prohibits the interception of electronic communications under certain circumstances, provides in pertinent part that

> No person having received any intercepted radio communication...knowing that such communication was intercepted, shall...use such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto.

Even though the Act refers only to "radio communications," the prohibition applies to the interception of satellite television transmissions. *See National Satellite Sports, Inc. v. Eliadas, Inc.*, 253 F.3d 900 (6th Cir. 2001).

To establish a violation of this provision, Plaintiff must establish (a) that Defendant intercepted a satellite communication; (b) knowing that such communication was intercepted; and (c) used the communication for his own benefit or for the benefit of another. A violation of the Act can be inferred from the purchase of piracy equipment. *Community Television Systems, Inc. v. Caruso*, 284 F.3d 430, 432 (2nd Cir. 2002) (purchase and installation of descrambling equipment in defendants home creates "at least a rebuttable presumption that [defendant] is liable."). In this case, Defendant purchased several Pirate Access Devices designed to assist in the unauthorized reception of DIRECTV satellite television programming. Under *Caruso*, Defendant's purchase of these devices creates a presumption of liability that has not been rebutted.

Moreover, by failing to respond to Defendant's request for admissions, Plaintiff has admitted the following relevant facts that further support liability.

(1) Defendant received DIRECTV's satellite transmissions of television programming without authorization from DIRECTV or payment to DIRECTV. (RFA ## 4 & 6.)

(2) Defendant assisted other persons in receiving DIRECTV's satellite transmissions of television programming without authorization from DIRECTV or payment to DIRECTV. (RFA ## 5 & 7.)

**8**

(3)   Defendant knew or should have known that receiving, or assisting others in receiving, DIRECTV programming without authorization from DIRECTV or payment to DIRECTV was prohibited.  (RFA ## 8-11.)

(4)   On or about January 19, 2001, Defendant placed an order for certain products from White Viper, and that the order was to be paid for by Defendant and shipped to Defendant.  (RFA ## 12-15.)

(5)   The January 19, 2001 order consisted of one Viper Smart Card Reader/Writer; two Viper Reader/Writers; and two Viper Super Unloopers.  (RFA ## 16-18.)

(6)   The abovementioned items are Unauthorized Access Devices.  (RFA ## 19-21.)

(7)   Defendant paid for and received the above-mentioned Unauthorized Access Devices.  (RFA ## 23 & 24.)

(8)   Defendant obtained the Unauthorized Access Devices with the intent to use them to facilitate the unauthorized interception of DIRECTV's encrypted satellite signal. (RFA ## 26.)

(9)   Defendant used or attempted to use the Unauthorized Access Devices to facilitate the unauthorized interception of DIRECTV's encrypted satellite signal, and was successful in doing so. (RFA ## 27-31.)

(10) Defendant knew or should have known that the Unauthorized Access Devices were primarily designed to be of assistance in the unauthorized interception of DIRECTV programming.  (RFA #32.)

(11)  The Unauthorized Access Devices are primarily of assistance in the in the unauthorized interception of DIRECTV programming, and that the use of such equipment is prohibited.  (RFA #33-36.)

The record establishes that Defendant intercepted satellite programming without authorization, knowing that the programming was unlawfully intercepted, and used the programming for his own benefit.  DIRECTV is entitled to summary judgment for liability on its claim that Defendant violated 47 U.S.C. § 605(a).[1]

C.  **Wiretap Act Claim**.

The Wiretap Act, 18 U.S.C. § 2511(a), makes it unlawful for any person to "intentionally intercept[], endeavor[] to intercept, or procure[] any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication."  The interception of satellite television signals is covered by the Wiretap Act.  *United States v. Lande*, 968 F.2d 907 (9th Cir. 1992).

Section 2520 of the Wiretap Act provides a private right of action for "any person whose...electronic communication is intercepted ...or intentionally used in violation of [18 U.S.C. §§ 2510-2521]" against the person who intercepted, disclosed, or intentionally used the electronic communication.  18 U.S.C. § 2520.

_____

[1]   The number of violations is discussed below in the context of damages.

**10**

Plaintiff points to a number of district court cases addressing the question of whether the private right of action created by § 2520 applies to violations of 18 U.S.C. § 2511(1)(a) (making unlawful the interception of electronic communications). The vast majority of these cases held that the private right of action created by § 2520 does apply to conduct that violates § 2511.[2]  *See e.g. DIRECTV, Inc. v. Hosey*, 289 F. Supp. 2d 1259 (D. Kan. 2003); *DIRECTV, Inc. v. Childers*, 274 F. Supp. 2d 1287 (M.D. Ala. 2003); *DIRECTV, Inc. v. Cardona*, 275 F. Supp. 2d 1357 (M.D. Fla. 2003).

One case, *DIRECTV v. DeCroce*, 332 F. Supp. 2d 715 (D. N.J. 2004) held that no private right of action exists for a violation of § 2511.  But *DeCroce's* status as an outlier has been noted and its reasoning questioned.  *See DIRECTV, INC. v. Hart,* 366 F. Supp. 2d 315, 320 (E.D.N.C. 2004).  In fact, § 2520(c)(1), the provision creating the private right of action, provides specific parameters for damages where the "conduct in violation [] is the private viewing of a private satellite video communication that is not scrambled or encrypted...."  18 U.S.C. 2520(c)(1).  It is therefore reasonable to assume that Congress intended sub-section 2520(c)(2), which applies to "any other action under this section" and provides for greater damages, to apply to the private viewing of satellite video communications that are not scrambled or encrypted.

Liability under § 2011 requires proof that Defendant intentionally intercepted an electronic communication, that

---

[2]    It does not appear that the Ninth Circuit or any district court within this circuit has addressed this issue.

**11**

information was obtained from the intercepted communication, and that defendant knew or should have known that interception was illegal.  *See Forsyth v. Barr*, 19 F.3d 1527 (5th Cir. 1994).  In this case, Defendant purchased and used the Pirate Access Devices made by Viper with the intent to intercept DIRECTV's otherwise scrambled satellite signal.  These devices were designed, marketed, and used to permit the illegal programming of valid DIRECTV Access Cards and the unloopers are primarily useful only for restoring functionality to illegally modified DIRECTV Access Cards that have been disabled by an ECM.  (Whalen Decl. ¶ 27).  Accordingly, Defendant intentionally intercepted DIRECTV's electronic communications in violation of 18 U.S.C. § 2511(1)(a).  Plaintiff's motion for summary judgment finding defendant liable on the wiretapping claim is **GRANTED.**

  **D.** **Conversion**.

  The Fourth Cause of Action alleges that Defendant converted Plaintiff's property in violation of California common law.  (Compl. at ¶¶27-30.)  Conversion is defined as any act of dominion wrongfully exerted over another's personal property in denial of or inconsistent with his or her rights therein.  *Zaslow v. Kroenert*, 29 Cal. 2d 541, 549 (1946); *Weiss v. Marcus*, 51 Cal. App. 3d 590, 599 (1975).  In order to establish a claim for conversion, the plaintiff must show (a) the right to possession of the personal property, (b) conversion by wrongful act or disposition of the property, and (c) damages.  *See G.S. Rasmussen & Assoc. v. Kalitta Flying Service*, 958 F.2d 896, 906 (9th

Cir.1992); *Franklin v. Municipal Court*, 26 Cal. App. 3d 884, 901 (1972).

Whether DIRECTV's programming constitutes "personal property" protected by the common law tort of conversion is an important question left unaddressed by Plaintiff's briefs. Conversion is generally applied to tangible property.  However, courts have relaxed this requirement.  For example, in *A & M Records, Inc. v. Heilman*, 75 Cal. App 3d 554 (1978), the court found that a claim for conversion may exist where defendant sold records duplicated from recordings manufactured and owned by plaintiff.  The *A & M Records* court reasoned that the recorded performances were plaintiff's "intangible personal property" and that the "misappropriation and sale of [such] intangible property of another without authority from the owner is conversion." *Id.*; *see also Kalitta Flying Service*, 958 F.2d at 906-07 (wrongful disposition of intangible property right in federal regulatory permit may constitute conversion).   Applying these principles, a district court in the Northern District of California found that exclusive rights to distribute proprietary cable programming satisfied the first element of conversion.  *Don King Productions/Kingvision v. Lovato*, 911 F. Supp 419 (N.D. Cal. 1995).

Here, Plaintiff possesses a right to distribute programming via satellite broadcast, thereby satisfying the first element of conversion.  Defendant has admitted to intentionally intercepting those broadcasts without permission.  This undoubtedly constitutes a wrongful act.  Plaintiff has also established that it suffered damages, the extent of which is discussed in greater detail below.

Plaintiff's motion for summary judgment on its conversion claim is **GRANTED**.

**E.   Damages**.

For the reasons set forth above, Defendant is liable under two separate provisions which provide for statutory damages: 47 U.S.C. § 605 and the Wiretap Act.  He is also liable for common-law conversion.  Plaintiff has requested statutory damages under § 605 in the amount of $50,000.  In the alternative, Plaintiff requests statutory damages in the amount of $50,000 under the Wiretap Act.[3]  Finally, if the court is not inclined to grant $50,000 in statutory damages under either statute, Plaintiff requests a hearing to determine the extent of damages due under its state law conversion claim.

**1.   Damages for Violation of 47 U.S.C. § 605(a)**.

Pursuant 47 U.S.C. § 605(e)(3)(B), any person aggrieved by a violation of § 605 party may recover an award of statutory damages for each violation in a sum of not less than $1,000 or more than $10,000, as the court considers just.  47 U.S.C. § 605(e)(3)(B).

---

[3]    Plaintiff suggests that a court may choose between the two statutes, but offers no authority for this proposition that is directly on point.  The only cited case on election of remedies, *Cablevision of S. Conn., Ltd. P'ship v. Smith*, 141 F. Supp. 2d 277, 285 (D. Conn. 2001), concerned a defendant who was found liable under both 47 U.S.C. 605 and 47 U.S.C. 533 (a provision parallel to § 605, making it unlawful to intercept cable television communications).  Plaintiff has not cited any cases concerning the interplay between § 605 and Wiretap Act damages.

**14**

Plaintiffs suggest that Defendant committed five separate violations here, one for each Pirate Access Device he purchased and used.   In support of this assertion, Defendants point to *Community Television Systems,* 284 F.3d at 435, which dealt with the use of descrambling devices by residential customers of a cable system.   In *Community Television*, the Second Circuit reasoned that, although "a violation might be thought to occur every time a person 'receives' TV images [] and 'uses' such images 'for his own benefit' by enjoying a telecast," this would impose liability upon "household guests, children, and baby-sitters."   Rather, the court concluded that "a violation occurs each time a device is purchased and installed."   *Id*.

However, it is not entirely clear that the facts of the instant case allow for a straightforward application of the *Community Television* standard.   The reasoning of *Community Television* suggests that it is the act of installing a descrambling system that constitutes a single violation, implying that the defendants in that case installed one piece of equipment that was sufficient to descramble the system.   Here, Defendant utilized several devices to intercept the DIRECTV broadcast.   It is not clear, however, whether each of the five devices purchased by Defendant would be sufficient on its own, or whether two or more devices must be applied in concert to achieve the unlawful goal.[4]   At a bare minimum, Defendant possessed the equipment

---

[4]     The record indicates that Defendant only owned one DIRECTV satellite and one DIRECTV access card.   Defendant did admit, by way of failing to respond to discovery, that he assisted others in intercepting DIRECTV programming, but DIRECTV has produced no independent evidence that Defendant actually did

**15**

necessary to perform one unlawful act of interception.  He has admitted successfully putting these devices to use.  (*See* RFA 27-31.)  DIRECTV also elicited evidence, in the form of an admission, that Defendant successfully assisted others in the act of unlawful interception.  But, DIRECTV produces no evidence establishing how many other persons he assisted, or for how long (RFA #7).  Moreover, whereas DIRECTV produced evidence that Defendant possessed the DIRECTV equipment necessary to intercept transmissions for his own use (the first violation), DIRECTV produces no documentary or physical evidence, apart from the admission, that others were actually assisted by Defendant.  Accordingly, only one violation has been conclusively established on this record.

DIRECTV requests the maximum award of $10,000 per violation.  In support of this request, DIRECTV submits the impacts of Defendant's conduct.  First, DIRECTV points out that the nature of the devices purchased by Defendant can be used continuously, over a substantial period of time.  DIRECTV also argues that piracy harms legitimate DIRECTV subscribers, who ultimately share some of the financial burden imposed by individuals who pirate DIRECTV. (Whalen Decl. ¶¶ 8-22, 27 and 28).  Finally, DIRECTV submits that satellite piracy "costs DIRECTV millions of dollars per year in lost revenues, which consequently affects the State of California, DIRECTV's state of incorporation and principal place of business, which loses significant tax revenues as a result of this lost income." (*Id*.)

_____

assist others.

Other courts have awarded the maximum penalty ($10,000 per violation) under such circumstances. *See e.g. Community Television Systems, Inc. v. Caruso*, 134 F. Supp. 2d 455, 461-62 (D. Conn. 2000), rev'd on other grounds*,* 284 F.3d 430 (2d Cir. 2002) (awarding maximum amount of damages under § 605 of $10,000 for each violation); *see also DIRECTV, Inc. v. Bloniarz*, 336 F. Supp. 2d 723, 726-27 (W.D. Mich. 2004)(same under Wiretap Act); *DIRECTV, Inc. v. Hedger*, 322 F. Supp. 2d 879, 883 (W.D. Mich. 2004) (rejecting cases awarding minimal damages under § 605 to DIRECTV and holding that the significant expense DIRECTV incurs and resources it employs to combat piracy is another aspect of DIRECTV's damages beyond the subscription and pay-per-view fees that is appropriately reflected in an award of the maximum statutory damages amount).  The maximum statutory penalty of $10,000 is appropriate here.   This award is more than sufficient to compensate Plaintiff.

### 2. Damages Under the Wiretap Act.

In the alternative, should the district court decline to award damages to DIRECTV, pursuant to 47 U.S.C. § 605(e)(3)(B), in the requested amount of $50,000, DIRECTV requests an award of statutory damages in that <u>same amount</u> pursuant to 18 U.S.C. § 2520(c)(2).

Section 2520(c)(2) provides that the Court may assess damages of whichever is the <u>greater</u> of

> (a)   the sum of the actual damages suffered by the
>        plaintiff and any profits made by the
>        violator as a result of the violation; or

17

(b)   statutory damages of whichever is greater of
      $100 a day for each day of violation or
      $10,000.

DIRECTV again contends that each Pirate Access Device purchased and used by Defendant constitutes a separate violation of the Wiretap Act.  DIRECTV therefore seeks statutory damages of $10,000 per Pirate Access Device purchased and used by Defendant in violation of § 2511.

In order to determine the appropriate damages award under § 2520(a)(2) the court may examine the actual damages incurred by DIRECTV as a result of Defendants' conduct.

### 3.   DIRECTV's Actual Damages.

As discussed above, Defendant purchased and successfully used five Pirate Access Devices (3 reader/writers and 2 unloopers), the primary use of which is to pirate DIRECTV's satellite programming. There are generally no other legitimate commercial or private uses for such devices. (Whalen Decl. ¶¶ 27-28).  The evidence also shows that Defendant purchased DIRECTV satellite equipment and activated DIRECTV Account No. 011841577 on or about March 30, 2000.  (Whalen Decl. ¶ 30; Exh. "B".).  Defendant maintained that account until July 8, 2001, at which time his account was disabled. (Whalen Decl. ¶ 30).

DIRECTV maintains that "[b]y possessing the DIRECTV satellite equipment and modifying a DIRECTV Access Card using the Pirate Access Devices, an individual using one modified Access Card has access to over a million dollars worth of programming services annually." (Whalen Decl. ¶¶19-22).  This figure is based upon the total value of all programming, if one was able to view

**18**

every broadcast on every channel, throughout the day, including viewing individual pay-per-view movies more than once per day. DIRECTV offers an alternative estimate of the potential value of pirated programming.  If a viewer accessed all viewable programming and movies only once, DIRECTV estimates that the value of such programming would be well over $150,000 annually. (Whalen Decl., ¶ 20).  Plaintiff offers no authority, however, suggesting that either of these expansive views of actual damages is appropriate.

Plaintiffs do present a third, more reasonable, figure, based upon DIRECTV's estimation of the value of services purchased by the average high-end DIRECTV user.  At a bare minimum, it is reasonable to infer that Defendant had access to the full range of DIRECTV's programming similar to that purchased by high-end subscribers (so-called "premium programming subscribers").  These premium programming subscribers are in the top 10%, in terms of programming value, of subscribers to DIRECTV.  (Whalen Decl., ¶¶ 20-22).[5]  The average monthly bill

---

[5]     DIRECTV also asserts that, because there is no DIRECTV hardware or subscription costs associated with viewing pirated programming, it is more likely that the user of a Pirate Access Device would make significantly greater use of DIRECTV's proprietary programming than would the honest subscriber who pays for each channel he uses.  However, logic could just as easily support the opposite conclusion.  If an individual pays for premium services, one would assume that he or she would feel compelled to watch the programming more than someone who pays absolutely nothing for those services.  While it is reasonable to assume that a pirate would watch a more expensive range of programming than would a basic subscription holder, DIRECTV presents no evidence suggesting that the pirate would access more valuable programming than that which is available to a premium programming subscriber.

sent to the typical DIRECTV high-end paying customer for the year 2003 was $229.08.  (Whalen Decl., ¶ 22).  This included both subscription and pay-per-view charges.  (Whalen Decl., ¶ 22).  Thus, assuming a user of a modified Access Card would view as much programming as a typical high-end paying customer, the annual value of programming stolen by such a user would be $2,748.96 (12 months' of programming at $229.08 per month) or $7.53 per day.  (Whalen Decl., ¶ 22).

Defendant first purchased a Pirate Access Device on January 19, 2001 and used the device to intercept DIRECTV's satellite programming starting on that date.  DIRECTV suggests that the damages resulting from Defendant's use of the Pirate Access Devices "may be calculated by totaling the number of days since his January 19, 2001 purchase to April 30, 2004, which is 1197 days, and multiplying that amount by $7.53, the daily value of programming stolen by Defendant...Accordingly, the actual damages DIRECTV has suffered as a consequence of Defendant's conduct is at least $9,013.41 ($7.53 x 1197 days)."  This is a reasonable figure.

DIRECTV points out, however, that this figure is limited to the value of the amount of programming Defendant likely accessed. DIRECTV has also presented evidence of additional expenses associated with the activity of pirates such as DEFENDANT. "Addressing piracy is the job of several departments and many individual employees and independent contractors, experts, and attorneys retained by DIRECTV."  (Whalen Decl., ¶ 8).  In addition, DIRECTV has incurred extensive technical expenses to address the piracy problem.  (Whalen Decl. ¶¶ 10-11).

20

Although DIRECTV presents general information concerning the overhead expenses it incurs fighting piracy, it does not offer a total figure or any breakdown attempting to ascribe a portion of these costs to any individual pirate, such as Defendant.

The record evidence is sufficient to establish actual damages in the amount of $9,013.41.  This is less than the statutory minimum of $10,000.  Accordingly, the statutory minimum of $10,000 per violation.  However, *see supra* note 3, Plaintiff concedes that the court may award damages under the Wiretap Act only as an alternative to damages under 47 U.S.C. § 605.  The total award will be limited to $10,000 under § 605.  At oral argument the court discussed a $20,000 award.  On further reflection, a $10,000 damages award will do justice in the case.

### 4.   Damages for the State Law Violations.

California common law does not provide for statutory damages for DIRECTV's Fourth Claim for Relief for conversion.  As the Court is not granting DIRECTV's request for statutory damages in the amount of $50,000 pursuant to 47 U.S.C. § 605(e)(3)(B) or 18 U.S.C. § 2520(c)(2), DIRECTV respectfully requests that the Court schedule a hearing to determine the appropriate damages for DIRECTV's common law claim of conversion.  The requested damages of $50,000 are cumulative and excessive.  DIRECTV's request for a hearing is DENIED.

//

//

//

//

21

**F.   Attorneys' Fees And Costs**.

DIRECTV also seeks attorneys' fees and costs pursuant to §
2520(b) of the Wiretap Act, which provides:

> In an action under this section, appropriate relief
> includes a reasonable attorney's fees and other
> litigation costs reasonably incurred.

18 U.S.C. § 2520(b)(3).  In support of its fee request, Plaintiff
submits the declaration counsel, Keli N. Osaki, Esq.  Attached to
Ms. Osaki's declaration are redacted billing statements,
reflecting more than $4,500 billed for work related to this case.
Ms. Osaki declares that she has "personally reviewed the invoices
[] and [has] determined that DIRECTV incurred $3,740.50 in fees
pursuing this motion for summary judgment."  (Osaki Decl., at
¶7.)  Plaintiff does not request reimbursement for time spent in
this case prior to the issuance of this Court's May 24, 2005
Order granting DIRECTV's Motion for Sanctions and Request for
Attorneys' Fees against Defendant Pahnke.  (Osaki Decl., ¶ 7.)

Plaintiff correctly asserts that the amount of recoverable
costs will be established in accordance with Federal Rules of
Civil Procedure 54 and applicable Local Rules after judgment.


**IV.   CONCLUSION**

For the reasons set forth above, Plaintiff's motion for
summary judgment is GRANTED.  Plaintiff is entitled to judgment
on its claims that Defendant violated (a) 47 U.S.C. § 605 and (b)
the Wiretap Act, and that defendant is liable under California
Law for converting Plaintiffs property.

Plaintiff is entitled to $10,000 in damages pursuant to 47
U.S.C. § 605 under the Wiretap Act, for a total damages award of

$10,000.  Plaintiff is also entitled to recover $3,740.50 in attorneys fees pursuant to 18 U.S.C. § 2520(b)(3).

     Plaintiff shall submit a form of judgment consistent with this decision within five (5) days of service of this order.


SO ORDERED.


DATED:  December 12, 2005.

                         /s/ OLIVER W. WANGER
                         _____
                         **OLIVER W. WANGER**
                         **United States District Judge**